IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

CURTIS C. LANDON, *Petitioner*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA, *Respondent,*

QUEMETCO METALS LIMITED, INC., *Respondent Employer*,

LIBERTY INSURANCE CORP., *Respondent Carrier*.

No. 1 CA-IC 14-0046
FILED 6-9-2016

Special Action - Industrial Commission
ICA Claim Nos.  20121-150492**
20121-701361*
Carrier Claim Nos.  WC608-000000**
WC608-A25774*

The Honorable Rachel C. Morgan, Administrative Law Judge

**AWARD SET ASIDE**

COUNSEL

Robert Hommel, P.C., Scottsdale
By Robert J. Hommel
*Counsel for Petitioner*

Industrial Commission of Arizona, Phoenix
By Andrew F. Wade
*Counsel for Respondent*

Klein, Doherty, Lundmark, Barberich & LaMont, P.C., Phoenix
By Lisa M. LaMont
*Counsel for Respondent Employer and Carrier*

---

**OPINION**

Chief Judge Michael J. Brown delivered the opinion of the Court, in which Presiding Judge Samuel A. Thumma and Judge Patricia A. Orozco joined.

---

**B R O W N**, Chief Judge:

¶1        This is a special action review of an Industrial Commission of Arizona ("ICA") award and decision upon review denying Curtis C. Landon's request for temporary partial disability benefits for nine months. The principal issue before us is whether Landon was precluded from receiving such benefits because a physician had released him to full-duty employment at the start of the nine-month period. As discussed below, a claimant released to full-duty employment is not precluded from receiving temporary partial disability benefits where the claimant can show a loss of earning capacity. Because the administrative law judge ("ALJ") failed to make necessary findings as to whether Landon suffered a reduced earning capacity during the nine-month period, we set aside the award.

**BACKGROUND**[1]

¶2        Quemetco Metals Limited, Inc. ("Quemetco"), hired Landon in 2005. Landon's work involved casting products for use in mining and frequently required him to lift between 65 and 100 pounds above his shoulder level. This work gradually caused Landon to develop bilateral shoulder injuries. Landon filed workers' compensation claims for benefits in 2011 for his left shoulder (with a March 15, 2011 stipulated injury date) and 2012 for his right shoulder (with a November 30, 2011 stipulated injury date), which the carrier denied. Landon timely protested those denials.

¶3        While Landon's claims were pending, Brian Matanky, M.D., performed surgery on Landon's left shoulder on March 8, 2012 and his right shoulder on May 31, 2012. When Landon attempted to start working "light

---

[1]        We consider the evidence in a light most favorable to upholding the ALJ's award. *Lovitch v. Indus. Comm'n*, 202 Ariz. 102, 105, ¶ 16 (App. 2002).

duty" for Quemetco some months later, at a time when his claims were still in "denied" status, he was told he could return to work only if released without restrictions. Because Landon could no longer afford to remain off work, he requested a release to full duty. Dr. Matanky conducted a medical examination and signed a full-duty release on September 4, 2012.

¶4 Landon promptly returned to Quemetco, but was then told his position had been filled by another individual and there was no other position for him at Quemetco. During the next few months, Landon obtained a number of short-term jobs through temporary agencies with other employers, earning lower wages than he earned at Quemetco. Although Landon experienced pain and weakness in both shoulders while working, he did not return to see Dr. Matanky until May 2013, after his workers' compensation claims were found compensable in April 2013. In June 2013, Dr. Matanky found that Landon's right shoulder condition had substantially deteriorated and he placed Landon on no-work status.

¶5 Landon then filed a hearing request for temporary partial disability benefits pursuant to Arizona Revised Statutes ("A.R.S.") section 23-1061(J). At the hearing, Dr. Matanky testified that as of September 4, 2012, Landon had reported 85 percent improvement, but still had some pain, stiffness, and swelling, and was therefore not finished with his recovery. Ultimately, however, Dr. Matanky concluded that because Landon's condition had improved significantly post-surgery, he issued a full-duty release, but with instructions for re-evaluation after four weeks if needed. Quemetco took the position that because Dr. Matanky had released Landon without any employment restrictions, Landon was precluded from receiving temporary partial disability benefits from September 4, 2012 to June 3, 2013.

¶6 Landon acknowledged at the hearing that when he attempted to return to work in September 2012, he would not have been able to lift 65 to 100 pounds over his head, but he thought Quemetco might put him in the "package area," where heavy lifting would not be required. Landon explained he had received short-term disability payments for several months after the surgeries, but that he asked Dr. Matanky for the full-duty release because those payments were scheduled to end on September 4. According to Landon, he lost his health insurance and transportation when his job was terminated, and thus was unable to return to see Dr. Matanky until his workers' compensation claims were found compensable in April 2013.

¶7        After the parties submitted post-hearing memoranda, the ALJ ruled in relevant part as follows:

> [Landon] testified that after his bilateral surgeries, he requested a full duty work release from Dr. Matanky because [Quemetco] would not allow him to return to work without one. . . . When [Landon] presented his full release to [Quemetco], he was informed his job was terminated and his position filled.    Subsequently, [Landon] worked for temporary employment agencies performing various jobs, . . . [and] had physical problems working because of pain and weakness in both of his shoulders[.]
>
> . . . .
>
> I find that [Landon] was medically released to full duty without restrictions to his date of injury job effective September 4, 2012.  I further find that [Landon] failed to meet his burden of proof that he was unable to perform his date of injury job as of September 4, 2012 or that he had any work restrictions from September 4, 2012 until [June 3], 2013.
>
> . . . .
>
> IT IS ORDERED that [Landon] is not entitled to temporary disability benefits[.]

¶8        Landon requested administrative review of the award, and the ALJ summarily affirmed.  Landon next sought timely review by this court, which has jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(2), 23-951(A), and Arizona Rules of Procedure for Special Actions 10.

## DISCUSSION

¶9        In reviewing ICA findings and awards, we defer to the ALJ's factual findings but review questions of law de novo. *Young v. Indus. Comm'n*, 204 Ariz. 267, 270, ¶ 14 (App. 2003).  An ALJ must include findings on all material issues in the award. *Post v. Indus. Comm'n*, 160 Ariz. 4, 7 (1989) (citation omitted).  "Although lack of findings on a particular issue does not invalidate an award per se," we will set aside an ALJ's award "if we cannot determine the factual basis of [the] conclusion or whether it was legally sound." *Id*.

4

### I. Eligibility for Temporary Partial Disability Benefits

¶10 The principal purpose of Arizona's workers' compensation system is to compensate an injured worker for lost earning capacity. *See Altamirano v. Indus. Comm'n*, 22 Ariz. App. 379, 380 (1974). During the progression of a workers' compensation claim, the worker typically may transition through three phases following a significant injury: (1) temporary total disability, when no work can be performed; (2) temporary partial disability, when recovery has progressed such that work may be performed, but the condition has not yet become medically stationary; and (3) permanent disability, when the condition cannot be medically improved to increase earning capacity. *See Hardware Mut. Cas. Co. v. Indus. Comm'n*, 17 Ariz. App. 7, 9-10 (1972). During each phase, the injured worker may receive compensation as provided in Arizona's Workers' Compensation Act ("the Act"). *See* A.R.S. §§ 23-1044, -1045. The unusual circumstances presented here fall roughly within the second phase described above, given that Landon was unable to work for several months following his surgeries, and then he was released to return to work but his condition had not been declared medically stationary.

### A. Loss of Earning Capacity

¶11 Landon argues he is entitled to temporary partial disability benefits from September 4, 2012 (when at his request he was released to full duty by Dr. Matanky) through June 3, 2013 (when Dr. Matanky placed him on no-work status) because he sustained a loss of earning capacity during that period. Quemetco counters that Landon is not entitled, under any circumstance, to receive temporary partial disability benefits because he was released to work without restrictions between September 4, 2012 and June 3, 2013. According to Quemetco, an injury-related work restriction is a pre-condition of any entitlement to temporary disability benefits and thus Landon's full-duty release on September 4, 2012 forecloses any recovery for loss of earning capacity. Resolution of this issue turns on the application of A.R.S. §§ 23-1044(D) and (G), as construed by pertinent case law.

¶12 "If a statute's language is subject to only one reasonable meaning, we apply that meaning." *Bell v. Indus. Comm'n*, 236 Ariz. 478, 480, ¶ 7 (2015). "We liberally construe [the] Act to effect its purpose of having industry bear its share of the burden of human injury as a cost of doing business." *Hahn v. Indus. Comm'n*, 227 Ariz. 72, 74, ¶ 7 (App. 2011) (internal quotations omitted).

¶13    An injured worker may be awarded temporary disability benefits consisting of "sixty-six and two-thirds percent of the difference between the wages earned before the injury and the wages which the injured person is able to earn thereafter." A.R.S. § 23-1044(A). Eligibility for such an award requires a determination that the industrial injury is not yet stationary and proof that the injury affected the worker's earning capacity. *See Western Cable v. Indus. Comm'n,* 144 Ariz. 514, 518 (App. 1985). A claimant's residual earning capacity can be established only by "evidence of job opportunities that are both (1) suitable, i.e.: of the type the claimant could reasonably be expected to perform in light of his impaired physical or mental condition, and (2) reasonably available." *Zimmerman v. Indus. Comm'n,* 137 Ariz. 578, 582 (1983).

¶14    In determining the amount of this reduced earning capacity, if any, under A.R.S. § 23-1044(A), an ALJ shall consider, among other things,

> any previous disability, the occupational history of the injured employee, the nature and extent of the physical disability, the type of work the injured employee is able to perform subsequent to the injury, any wages received for work performed subsequent to the injury and the age of the employee at the time of the injury.

A.R.S. § 23-1044(D).

¶15    In 2009, the legislature amended subsection D, adding in pertinent part the following:

> If the employee is unable to return to work or continue working in any employment after the injury due to the employee's termination from employment *for reasons that are unrelated to the industrial injury*, the commission *may* consider the wages that the employee could have earned from that employment as representative of the employee's earning capacity.

*Id.* (emphasis added); *see also* 2009 Ariz. Sess. Laws, ch. 184, § 5.

### 1.    Relation of Industrial Injury to Employment Loss

¶16    Quemetco argues that under the 2009 amendment, an employee's inability to continue working is "related" to the industrial injury only if the injury prevented the employee from performing his job

duties. According to Quemetco, because Landon was released to full-duty status, his injury was "unrelated" to the reason why his employment was terminated. This narrow interpretation, however, is contrary to generally used definitions of the word "related." *See* Black's Law Dictionary (10th ed. 2014) ("[c]onnected in some way; having relationship to or with something else"); Webster's II New College Dictionary (3d ed. 2005) ("connected" or "associated"); *see also Yollin v. City of Glendale*, 219 Ariz. 24, 28, ¶ 9 (App. 2008) (explaining we may consult respected dictionaries for the plain meanings of words that are undefined in a statute). Applying the commonly understood meaning of "related," an employee's termination from employment is related to the employee's industrial injury (under A.R.S. § 23-1044(D)) if it is connected to or associated with the industrial injury.

**¶17** Interpreting the 2009 amendment as suggested by Quemetco would be inconsistent with a related provision of A.R.S. § 23-1044, which establishes the framework for resolving "any issue . . . raised regarding whether the injured employee has suffered a loss of earning capacity because of an inability to obtain or retain suitable work[:]"

> In cases involving *loss of employment*, the employer or carrier may present evidence showing that the injured employee was *terminated from employment or has not obtained suitable work*, or both, due, *in whole or in part*, to economic or business conditions, or other factors unrelated to the injury. The injured employee may present evidence showing that such *termination or inability to obtain suitable work is due*, *in whole or in part*, to the industrial injury or limitations resulting from the injury.

A.R.S. § 23-1044(G)(2) (emphasis added); *see also Bell*, 236 Ariz. at 480, ¶ 7 (explaining that when statutory provisions relate to the same subject matter, they should be construed together and reconciled "whenever possible, in such a way so as to give effect to all the statutes involved" (quotation omitted)). A reading of §§ 23-1044(D) and (G) together indicates that the legislature did not intend to prevent an injured employee from showing that his termination and subsequent inability to find suitable, available alternative employment was caused, at least in part, by his industrial injury. Moreover, construing A.R.S. § 23-1044 in the restrictive manner advanced by Quemetco would frustrate the remedial purposes of the Act, "to dispense with, as much as possible, the litigation between employer and employee and to place upon industry the burden of compensation." *Marriott Corp. v. Indus. Comm'n*, 147 Ariz. 116, 121 (1985).

**¶18**        This construction of A.R.S. § 23-1044 is consistent with Arizona case law addressing the showing required to support a loss of earning capacity.  As recognized by our supreme court, "[t]he law should compensate for losses attributable to industrial injuries, but not for losses attributable to other factors."  *Dep't of Pub. Safety v. Indus. Comm'n*, 176 Ariz. 318, 321 (1993) ("*D.P.S.*").[2]  A claimant has the burden of proving a loss of earning capacity, which requires establishing his inability to return to date-of-injury employment and either to make a good faith effort to obtain other suitable employment or to present testimony from a labor market expert to establish his earning capacity.  *Zimmerman*, 137 Ariz. at 580.  If the worker meets this initial burden of proof, the employer or carrier must then "go forward with evidence demonstrating the availability of suitable employment and/or the lack of a causal relationship between the claimed loss of earning capacity and the injury."  *D.P.S.*, 176 Ariz. at 322.  Various factors may affect whether a job is "suitable" and/or "available," and the "determination must be made in each case, regardless of whether the employee resumed the former job and then lost it, or the reasons why it may have been lost."  *Id.*; *see also Zimmerman*, 137 Ariz. at 582-84.  The law does not require a claimant to show that the industrial injury was the "sole

---

[2]        In adopting the 2009 amendment to A.R.S. § 23–1044(D), the legislature expressed its intent to overrule *D.P.S.* "to the extent that the court opinion precludes consideration of wages earned from employment from which the employee has been terminated for reasons unrelated to the industrial injury."  2009 Ariz. Sess. Laws, ch. 184, § 7.  However, the analysis in *D.P.S.* does not preclude such consideration by an ALJ.   Instead, *D.P.S.* held that the "unrelated reasons" are "significant only where . . . they, rather than [the] claimant's disability, caused the subsequent inability to secure work."  *D.P.S.*, 176 Ariz. at 323.  Stated differently, the court concluded that compensation is unavailable only if the injury plays "no part in the worker's inability to find suitable employment."  *Id.*  Thus, the 2009 amendment, which did not address subsection (G)'s provisions addressing "loss of employment," merely clarifies the court's holding and does not supersede it.  The legislature also stated that the 2009 amendment was intended to give the ICA "broad discretion" to determine a loss of earning capacity, "including whether and to what extent to consider relevant evidence of wages earned in employment that has been terminated."  2009 Ariz. Sess. Laws, ch. 184, § 7.  The analysis in this opinion is consistent with the statements of intent the legislature included in the 2009 amendment.

cause" of the loss because doing so "would effectively deprive many genuinely injured workers of benefits when unrelated causes have combined with their disabilities to make it difficult or impossible to secure other employment." *D.P.S.*, 176 Ariz. at 325.

**¶19** Quemetco asserts that because Landon had been absent from work for approximately six months, replacement of his position by another worker was necessary due to "business conditions" based on the long absence. Thus, Quemetco acknowledges that it terminated Landon's employment because his industrial injuries required surgery and the recovery time associated with those surgeries made termination the most prudent economic decision. Given the undisputed facts demonstrating that Landon's employment would not have been terminated absent his industrial injury, his termination was related to his industrial injury under A.R.S. § 23-1044(D). *See D.P.S.*, 176 Ariz. at 323 ("Termination reasons unrelated to the industrial injury, such as layoff, strike, economic conditions, or misconduct become significant only where the evidence demonstrates that they, rather than claimant's disability, caused the subsequent inability to secure work."); *cf. Wiedmaier v. Indus. Comm'n*, 121 Ariz. 127, 130 (1978) (noting that if economic conditions are the *sole* cause of unemployment, then there is no right to an award for lost earning capacity) (emphasis added)).[3] Accordingly, the second sentence in subsection (D) (addressing the situation where termination is caused for reasons unrelated to the industrial injury) does not apply here and Landon qualifies for temporary benefits under A.R.S. § 23-1044(A) if he is able to establish a loss of earning capacity.

---

[3] Quemetco cites *Olszewski v. Indus. Comm'n*, 113 Ariz. 282 (1976), for the proposition that an injured employee given a full-duty release to work is ineligible for temporary disability benefits. In *Olszewski*, the injured employee sustained a series of workplace injuries from "many accidents over the years." *Id*. at 283. Although the employee was eventually released to "regular work" following his last accident, the employer had the employee assume timekeeping duties at a lower wage rather than allowing him to resume his duties as a foreman. *Id*. at 282-83. Because the loss of wages was not attributable to the employee's injury, but rather to his repeated involvement in serious workplace accidents, our supreme court concluded the employee was ineligible for benefits. *Id*. at 283. The supreme court did not suggest, however, that an employee released to regular work is, as a matter of law, ineligible for temporary disability benefits.

### 2. Determining The Amount Of Loss Of Earning Capacity

¶20        Determining the amount of Landon's loss of earning capacity, if any, is governed by the remainder of subsection (D), as well as subsection (G)(2), of A.R.S. § 23-1044. Under subsection (D), an ALJ must consider Landon's previous disability, if any, his occupational history, the nature and extent of his injuries, what kind of work he could perform after the shoulder injuries, the wages he received for work performed after the injuries and his age at the time he was injured. *See also Zimmerman*, 137 Ariz. at 582 (After considering various factors, an ALJ evaluates the evidence presented to determine whether "there is employment reasonably available which the claimant could reasonably be expected to perform, considering his physical capabilities, education and training[.]").

¶21        Under subsection (G)(2), Quemetco may present evidence showing that Landon was terminated or has not obtained suitable work due to economic or business conditions. Landon, on the other hand, may present evidence demonstrating that his termination from Quemetco and his inability to obtain suitable work after his shoulder injuries were based, in whole or in part, on the injuries or limitations resulting from the injuries. Thus, even if there are other reasons why Landon was terminated or could not obtain suitable work, such as the economic justification offered by Quemetco, Landon may show that the injury played at least some part in the reasons for termination or lack of suitable work. *See* A.R.S. § 23-1044(G)(2) ("The administrative law judge shall consider all such evidence in determining whether and to what extent the injured employee has sustained any loss or additional loss of earning capacity."); *see also D.P.S.*, 176 Ariz. at 322-23 (explaining that compensation benefits are payable if limitations resulting from an industrial injury contribute to a claimant's inability to secure employment at pre-injury wage levels); *Fletcher v. Indus. Comm'n*, 120 Ariz. 571, 573 (App. 1978) (noting that when a "claimant loses employment as a direct result of economic or other reasons unrelated to his injury, he may nevertheless be entitled to compensation if he is able to show that the difficulties in finding other employment are due to his injury").

¶22        Quemetco contends that if it had not filled his position, Landon would have been able to earn his pre-injury wages because he was willing and able to return to work. Landon's position, however, was no longer available to him because of an economic decision by Quemetco, so he could not earn the wages even if he could have accomplished the lifting required for the job. Landon testified that he sought to return to work because he needed the money and he believed he could fulfill other duties

that would not require heavy lifting, such as those carried out in the package area. Quemetco argues further that Landon's ability to work in his pre-injury capacity is supported by the temporary jobs he obtained after his position with Quemetco was terminated. But Landon's employment in temporary jobs does not mean he is precluded from receiving *any* temporary partial disability benefits. *See Pennell v. Indus. Comm'n*, 152 Ariz. 276, 280 (App. 1987) ("Post-injury earning capacity itself is based on employability in general, not simply on employability in the pre-injury occupation."). It is undisputed that Landon earned less money in those temporary jobs than he did at Quemetco and it would be contrary to the purposes of the Act to penalize a claimant who works diligently to obtain some employment in place of his pre-injury work by depriving him of the opportunity to obtain temporary benefits. *See Fullen v. Indus. Comm'n*, 122 Ariz. 425, 429 (1979) (noting the purpose of the Act is to protect injured workers and compensate valid claims).

## II.     Insufficient Findings

**¶23**     Although an ALJ is not required to make a specific finding on every issue presented, the ALJ must specifically resolve primary issues in the case, thereby permitting the reviewing court to determine whether the basis of the ALJ's conclusion is legally sound. *See, e.g., Cavco Indus. v. Indus. Comm'n,* 129 Ariz. 429, 435 (1981). The ultimate issue here is whether Landon was entitled to receive temporary partial disability benefits between September 4, 2012 and June 3, 2013, and if so, the amount of such benefits, which turns on (among other things) whether Landon demonstrated that he made good faith efforts to obtain other suitable employment but no equivalent employment was available to him. *See D.P.S.*, 176 Ariz. at 322 ("The administrative law judge must make a determination, based on all the facts and circumstances, whether and to what extent the worker's disability has prevented employment." (citing A.R.S. § 23-1044(G))).

**¶24**     Landon testified he was still recovering from his injuries when he was given the full-duty release, and that he faced difficulty in obtaining other work. Although he was successful in finding several temporary positions, he received significantly less than what he had earned with Quemetco. However, the ALJ made no findings as to whether Landon met his burden of showing why he was unable to return to his date-of-injury employment or whether he made a good faith effort to obtain other suitable employment. *See Zimmerman*, 137 Ariz. at 584 ("After considering all these factors, if the finder of fact can conclude that there is a reasonable probability that the injured worker can find suitable employment on a

regular basis, then and only then may it be found that such employment is 'reasonably available.'"). Nor is there any indication that the ALJ considered the various factors outlined in A.R.S. § 23-1044(D) and (G) relating to whether Landon was in a position where he could find suitable employment that was reasonably available.

¶25 Without findings specifically addressing loss of earning capacity, and the factors related to it, we are unable to determine whether the ALJ erred by denying Landon temporary partial disability benefits. *See Post*, 160 Ariz. at 7 (explaining an appellate court will not speculate about the basis of the award or become a factfinder); *Hardware Mut. Cas. Co.*, 17 Ariz. App. at 10 (explaining that "when earning capacity during this period has been placed in controversy," an ALJ must "make a specific finding thereon.").

## CONCLUSION

¶26 Because the ALJ erred in determining that Landon was not entitled to an award of temporary partial disability benefits, and failed to make findings as to whether Landon sustained a loss of earning capacity following his termination of employment, we set aside the award.



Ruth A. Willingham · Clerk of the Court
F I L E D : AA