NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JERROLD CHENOWETH, *Petitioner Employee*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA, *Respondent,*

R. BEHMER ROOFING, *Respondent Employer*,

COPPERPOINT WESTERN INSURANCE CO., *Respondent Carrier,*

INDUSTRIAL COMMISSION OF ARIZONA SPECIAL FUND,
*Respondent Party in Interest.*

No. 1 CA-IC 19-0040
FILED 4-1-2021

Special Action - Industrial Commission
ICA Claim No. 20152-940233
Carrier Claim No. 15W01948
The Honorable Paula R. Eaton, Administrative Law Judge

**AWARD SET ASIDE**

COUNSEL

Joel F. Friedman PLLC, Phoenix
By Joel F. Friedman
*Counsel for Petitioner Employee*

Industrial Commission of Arizona, Phoenix
By Gaetano J. Testini, Afshan Peimani
*Counsel for Respondent, ICA; ICA Special Fund, Respondent Party in Interest*

CopperPoint Western Insurance Company Legal Services, Phoenix
By Chiko F. Swiney
*Counsel for Respondent, Employer and Carrier*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge David B. Gass joined.

---

**B R O W N**, Judge:

¶1 Jerrold Chenoweth challenges an Industrial Commission of Arizona ("ICA") award that determined his lost earning capacity ("LEC"). Because the award lacks sufficient findings, we set it aside.

**BACKGROUND**

¶2 Chenoweth worked as a roofer for over 30 years. He owned and operated a roofing business for 16 years, where his job duties, among other things, included accepting payments, providing receipts, and handling customer contact. Then he worked for R. Behmer Roofing, Inc. ("Behmer") from 2007 to 2017. In October 2015, Chenoweth fell from a roof and injured his right heel and leg, eventually requiring a total ankle replacement. The ICA calculated his lost earning capacity at 51.53% of his average monthly wage for a 15-month period starting in September 2017. Chenoweth timely protested, asserting he had a total LEC during the relevant period. Over the course of several months, an administrative law judge ("ALJ") conducted evidentiary hearings.

¶3 Chenoweth testified about his background, injuries, and efforts to find suitable employment. He dropped out of school after eighth grade, but later obtained a GED certificate. He lacks computer skills and needs to elevate his ankle frequently. Chenoweth said he talked to people he knew about potential jobs, and his wife created a profile for him on various job application websites, including: monster.com, careerbuilder.com, and indeed.com. He also contacted companies that were listed in a report prepared by the insurer's labor market consultant, which included Pink Jeep Tours, Fast Payday Loans, Sedona Off Road Adventures, Ace Cash Express, and Arizona Shuttle. Chenoweth explained that none of these efforts led to him finding suitable employment.

¶4            Two orthopedic physicians, Dr. Stephen Knecht and Dr. Peter Mitchell, testified to work restrictions that would be necessary given Chenoweth's health condition.  Both doctors agreed he could not return to work as a roofer.  Knecht, the surgeon who performed Chenoweth's ankle surgeries, testified that Chenoweth can no longer work on ladders, roofs, and uneven or inclined surfaces.  Knecht assumed Chenoweth could drive up to 30 minutes at a time.  Mitchell, who performed an independent medical examination on behalf of the insurer, testified that in an eight-hour day Chenoweth could stand two to three hours at most, with breaks.  Essentially, Mitchell recommended sedentary work but believed that Chenoweth could work full time with no limitation on his ability to drive.

¶5            Labor market consultants David Janus (for Chenoweth) and Lisa Clapp (for the insurer) prepared reports and testified about suitable jobs that were available during the period at issue, taking into consideration the doctors' restrictions and Chenoweth's experience and abilities.   Janus opined that Chenoweth had a total loss of earning capacity for the relevant period.  Janus reasoned that Chenoweth's lack of marketable computer skills significantly impaired his job prospects, even for sedentary jobs.  Janus suggested that the only job open to Chenoweth—given his medical restrictions—was a fast-food cashier.

¶6            Clapp testified about several suitable jobs for Chenoweth, including working for a staffing company that filled positions at a local bottling company to put labels on bottles, inspect the labeling of bottles, or place bottles in a crate.  With those jobs as the basis for her opinion, she testified Chenoweth's LEC was 48.89% during the relevant period.  Clapp also opined he could work a part-time position as a ticket taker at a movie theater, which would have resulted in a 75.6% reduction in earning capacity.

¶7            The ALJ found Chenoweth's testimony not credible and concluded Mitchell's opinion was more probably correct and well-founded than Knecht's.  The ALJ also gave more weight to Clapp's analysis. The ALJ determined Chenoweth was able to work in various sedentary employment positions and thus had a 48.89% LEC for the 15-month period at issue.  After denying Chenoweth's request for administrative review, the ALJ summarily affirmed her award.  Chenoweth then appealed to this court.

**DISCUSSION**

¶8            In reviewing the ICA's award, we defer to the ALJ's factual findings but review legal questions de novo. *Young v. Indus. Comm'n*, 204

Ariz. 267, 270, ¶ 14 (App. 2003). An ALJ must make findings on all material issues necessary to resolve the case. *Post v. Indus. Comm'n*, 160 Ariz. 4, 7–9 (1989); *see also Aguirre v. Indus. Comm'n*, 247 Ariz. 75, 75, 77, ¶¶ 1, 13 (2019). And "[a]lthough [a] lack of findings on a particular issue does not invalidate an award per se," we will set aside the award "if we cannot determine the factual basis of [the] conclusion or whether it was legally sound." *Post,* 160 Ariz. at 7. As explained by our supreme court,

> administrative law judges should explicitly state their resolution of conflicting evidence on material and important issues, find the ultimate facts, and set forth their application of law to those facts. We do not require any particular form, nor even great detail. However, *we must know how the judge reached his or her conclusion*.

*Id.* at 8–9 (emphasis added). Chenoweth argues the ALJ's lack of findings precludes proper appellate review of the award. He contends the ALJ failed to make specific findings about his credibility, conflicts within the medical experts' testimony, and the availability and suitability of various employment positions.

¶9 To calculate an injured worker's LEC, the goal is to "determine as near as possible whether in a competitive labor market the subject in his injured condition can probably sell his services and for how much." *Davis v. Indus. Comm'n*, 82 Ariz. 173, 175 (1957).

> Determining the amount of an injured worker's LEC, if any, is governed in part by A.R.S. § 23-1044, which requires consideration of, 'among other things, to any previous disability, the occupational history of the injured employee, the nature and extent of the physical disability, the type of work the injured employee is able to perform after the injury, any wages received for work performed after the injury and the age of the employee at the time of injury.'

*Smith v. Indus. Comm'n*, 247 Ariz. 470, 474, ¶ 13 (App. 2019).

¶10 Initially, the burden of proving an LEC is on the claimant to establish he is unable to return to date-of-injury employment, and either (1) show he made a good faith effort to obtain other suitable employment, or (2) have a labor market consultant testify to establish his earning capacity. *Landon v. Indus. Comm'n*, 240 Ariz. 21, 26–27, ¶ 18 (App. 2016). If the claimant meets the initial burden of proof, the burden shifts to the insurer to prove "there is employment reasonably available which the claimant

could reasonably be expected to perform, considering his physical capabilities, education and training." *Germany v. Indus. Comm'n*, 20 Ariz. App. 576, 580 (1973).

**¶11** Here, the ALJ stated Chenoweth had the initial burden to prove that he could not find suitable employment. But the ALJ made no findings about Chenoweth's efforts to find employment and whether he met that burden. As a result, the ALJ made no mention of whether the burden shifted to the employer or whether the employer satisfied its burden to "show the availability of suitable employment." *See Roach v. Indus. Comm'n*, 137 Ariz. 510, 511 (1983); *Smith*, 247 Ariz. at 473, ¶ 10 ("By failing to address whether [the claimant] met the initial burden of proof, the ALJ overlooked the principle that even if a claimant does not have injury-related work restrictions, the claimant may still receive an LEC award.") (citing A.R.S. § 23-1044(G)(2)).

**¶12** In *Smith*, we noted the ALJ failed to make any finding on whether the claimant met his initial burden of proving an LEC, but we did not set aside the award on that basis. 247 Ariz. at 473–75, ¶¶ 10–11, 21. Unlike this case, however, nothing in *Smith* indicates the claimant challenged the award for insufficient findings. We also concluded that regardless of the lack of a finding on burden shifting, the evidence showed the claimant could not perform the work required to return to her date-of-injury employment, and she made a good faith effort to obtain other suitable employment. *Id.* at 473, ¶ 11. Thus, *Smith* does not excuse an ALJ from the obligation to make findings on all material issues.

**¶13** Although the ALJ found that Chenoweth's testimony was "not credible," she did not explain how she reached that finding or point to any portion of his testimony showing it was "self-contradictory, inconsistent with other evidence, or directly impeached." *See Holding v. Indus. Comm'n*, 139 Ariz. 548, 551 (App. 1984) (explaining the ALJ's role in determining witness credibility). Nor is there any indication the ALJ considered the various factors outlined in A.R.S. § 23-1044(D) and (G) relating to whether Chenoweth could find suitable employment that was reasonably available. *See Landon*, 240 Ariz. at 29, ¶ 24; *see also Kamman v. Indus. Comm'n*, 2 CA-IC 2018-0005, 2018 WL 6033516, at *3 (Ariz. Ct. App. Nov. 16, 2018) ("Although several of the factors in § 23-1044(D) are mentioned in the ALJ's summary of the evidence, there is no indication in the award that she considered them when making her determination; indeed, it does not even contain a reference to § 23-1044(D).").

¶14　　　　The ALJ also found Clapp's analysis regarding various positions with the staffing company and Chenoweth's suitability for those positions is "more probably correct and well-founded" than the analysis Janus offered, and that Chenoweth "is capable of working in various sedentary positions." But the ALJ failed to reconcile Clapp's testimony with the testimony of the medical experts, and specifically, Dr. Mitchell, who testified that Chenoweth could stand for a total of two to three hours a day in an eight-hour period with breaks. And both doctors agreed it would be reasonable for Chenoweth to need to elevate his leg periodically. Clapp admitted that if the ALJ found that Chenoweth needed to elevate his leg periodically, the jobs Clapp recommended would "at least be more complicated."

¶15　　　　Clapp also acknowledged she did not ask the potential employers if there are productivity requirements for at least two of the positions, and the record is silent on whether the various positions she discussed would allow for the accommodations Chenoweth needed, including elevating his leg periodically. But the law requires material factors to be explicitly communicated to the surveyed employers before the results of such a survey can be given any weight. *See Zimmerman v. Indus. Comm'n*, 137 Ariz. 578, 582 (App. 1983) (noting that in determining suitability it must be shown with specificity that the physical requirements of the employment and that "abstractions are not sufficient") (quotation and citation omitted). The ALJ did not address Chenoweth's ability to work in Clapp's recommended jobs in light of his uncontroverted work restrictions.

¶16　　　　The ALJ also failed to address whether the jobs Clapp identified were reasonably available, and more specifically, during the relevant time period on which the LEC was based. Clapp testified that the staffing company positions, which the ALJ relied on, had two or three openings per year and six or seven people with experience applied. But "[t]he number of openings alone fails to tell us anything about whether a job is 'reasonably available.'" *Smith*, 247 Ariz. at 475, ¶ 16 (citation omitted).

¶17　　　　Without these findings, we are left to speculate whether the ALJ properly applied the law in reaching her ultimate conclusion on Chenoweth's LEC. *See Post*, 160 Ariz. at 7 (declining to "speculate that the [ALJ] made 'the conclusion' that no causal relationship existed" between a new condition and the original injury). Nor will we presume that the ALJ's general findings on credibility of the witnesses satisfy the level of specificity outlined by our supreme court. *See Douglas Auto & Equip. v. Indus. Comm'n.*, 202 Ariz. 345, 347, ¶ 9 (2002) ("The findings must be specific, not only to

encourage [ALJs] to consider their conclusions carefully, but also to permit meaningful judicial review."). Because we cannot conduct a proper review of the award, it must be set aside. *See id.; Landon*, 240 Ariz. at 29, ¶¶ 24–26 (setting aside LEC award in part because the ALJ made no findings as to whether Landon met his burden of showing why he was unable to return to his date-of-injury employment or whether he made a good faith effort to obtain other suitable employment). Thus, we need not address Chenoweth's argument that the ALJ should not have accepted Clapp's December 2018 labor market report based on untimely disclosure.

## CONCLUSION

¶18        The award is set aside.



AMY M. WOOD • Clerk of the Court
FILED:    AA