IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SHAWN LAWLESS, *Petitioner Employee*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA, *Respondent*,

NORTHERN AZ CONSOLIDATED FIRE DIST, *Respondent Employer*,

SECURIS INSURANCE POOL, *Respondent Carrier*.

No. 1 CA-IC 24-0009

FILED 04-29-2025

Special Action – Industrial Commission
ICA Claim No. 20221990004
Carrier Claim No. 2021000333S
The Honorable Kenneth Joseph Hill, Administrative Law Judge

**AFFIRMED**

COUNSEL

Taylor & Associates PLLC, Phoenix
By Nicholas C. Whitley
*Counsel for Petitioner Employee*

Industrial Commission of Arizona, Phoenix
By Afshan Peimani
*Counsel for Respondent*

Lundmark Barberich La Mont & Puig PC, Phoenix
By R. Todd Lundmark, David T. Lundmark
*Counsel for Respondent Employer and Carrier*

---

**OPINION**

Judge Daniel J. Kiley delivered the opinion of the Court, in which Presiding Judge Michael S. Catlett and Judge David D. Weinzweig joined.

---

**K I L E Y**, Judge:

¶1        Shawn Lawless, who worked for the fire district now known as the Northern Arizona Fire District ("NAFD"), appeals from an Industrial Commission of Arizona ("ICA") award denying him workers' compensation benefits for a mental stress injury. Because Lawless failed to show that he was subjected to unusual, unexpected, or extraordinary stress on the job, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        We view the facts in the light most favorable to sustaining the ICA award. *See Salt River Project v. Indus. Comm'n*, 128 Ariz. 541, 544-45 (1981).

¶3        Lawless's claim arises out of work-related events that occurred in April 2022. At the time, Lawless had been a firefighter/paramedic for more than twenty years. Lawless was diagnosed with Post-Traumatic Stress Disorder ("PTSD") in 2017 when, while working as a firefighter/paramedic in Lake Havasu City, he responded to the scene of a fatal watercraft accident. Lawless participated in 24 counseling sessions for PTSD, and then left that position to work for the NAFD.

¶4        In February 2022, Lawless began seeing therapist Paula Lupo. Lupo diagnosed Lawless with chronic PTSD arising out of "exposure to actual and threatened death" and the "aversive details of the traumatic events," and recommended therapeutic treatment to help develop skills to cope with "troubling thoughts and images."

¶5        Both before and after the events giving rise to his claim, the NAFD determined that Lawless violated its workplace policies in a variety

of ways. He received a verbal warning in late January 2022 for failing to verify that a medical supply box was on board his vehicle before going out on a call. About two months later, Lawless's supervisors conducted "a verbal counseling meeting" with him at which, *inter alia*, they informed him that doing work for "his private business while on duty" was "inappropriate" and must "cease immediately."[1] Issues then escalated in April 2022.

¶6             On April 7, a battalion chief told Lawless that, due to "staffing issues," an off-duty firefighter would be needed to work overtime on April 12. Lawless stated that he was unavailable. Two days later, on April 9, another battalion chief told Lawless that he was required to work overtime the following day "due to low staffing levels." Lawless again stated that he would not work the extra shift. On April 13, Lawless was told that he was "under investigation for numerous performance and conduct issues" and placed on leave.

¶7             In June 2022, Lawless met with NAFD Chief Dennis Hoke to discuss his continued employment. Informing Lawless that the internal investigation determined that he "violated numerous NAFD policies" and committed "unprofessional" acts, Hoke offered Lawless the opportunity to enter into "a Last Chance Agreement in lieu of termination." That agreement required Lawless to participate in a Performance Improvement Plan. Although Lawless signed the agreement, three days later, he submitted a note from his doctor stating that Lawless should be "excuse[d] . . . from work due to a medical condition."

¶8             On July 18, 2022, Lawless filed a claim for benefits for a mental stress injury. In his "Report of Injury," Lawless identified his claimed injury as "mental trauma and stress," and described the injury-causing event as an "Active Shooter Incident resulting in acute post-traumatic stress."

¶9             NAFD and its carrier, Securis Insurance Pool, denied the claim. Lawless requested a hearing to challenge the denial. A hearing was held over several dates from February 2023 through May 2023.

¶10            At the hearing, Lawless's counsel clarified that Lawless's claim was based on paramedic calls on two separate shifts on April 1 and April 7, 2022.

---

[1] Lawless, who owns "a media company," was observed at work "editing photos" when, according to NAFD Chief Dennis Hoke, "he should have been working and training with his crew."

¶11        Testimony at the hearing established that, on the afternoon of April 1, Lawless and fellow firefighter and emergency medical technician Dillon Haskell were dispatched to a scene where, they were told, an officer with the Arizona Department of Public Safety ("DPS") had been injured when "three subjects with semiautomatic rifles . . . shot up his car." Before responding to the scene, Lawless and Haskell donned body armor for their own safety. By the time Lawless and Haskell arrived, the wounded DPS officer had been taken to a hospital. Although police officers were on scene, Lawless testified that "the scene was not secure," explaining that "we didn't know where the shooters were" and "[y]ou could still smell the gunpowder in the air." Lawless further testified that, after "confirm[ing] there was nobody else . . . on scene that needed us," they left. He and Haskell were on scene for a total of about ten minutes.

¶12        While returning to the station, Lawless testified, he and Haskell received a call to respond to "a possible hit-and-run" at "an intersection two blocks away." The call indicated that the suspects who shot the DPS officer "had possibly hit somebody" in their flight from the scene. Upon arriving, Lawless and the other responders were told (evidently by eyewitnesses) that a bicyclist had been struck by a car but "had gotten up and went away." After they "were unable to find" the bicyclist, they returned to the station.

¶13        According to Lawless, he and Haskell were later dispatched to Mohave Community College, where police had shot "one of the subjects" involved in the shooting of the DPS officer earlier that day. They were asked "to render care" for the injured suspect. Upon arriving at the college, they were "directed to an area . . . behind one of the ancillary buildings next to a big open field." "[W]e went around the back of the building," Lawless testified, and "found the subject cuffed on the ground." They "[d]id a quick, rapid assessment" of the injured suspect while armed officers "were standing over us." Due to concern that one of the shooters who were still at large might be "in the open field" next to them, Lawless stated, "we just grabbed" the injured suspect and brought him to the fire engine to prepare him for transport to the hospital. When asked how much time elapsed "from the time you arrive[d]" until "grabbing him and getting him back to the engine and leaving," Lawless estimated that it was "[l]ess than ten minutes." He rode with the injured suspect to the hospital, where "the trauma team" took over. Lawless then returned to the station where, he testified, his "heart was pounding," his "anxiety was through the absolute roof," and he was unable to sleep "for the next almost two days."

¶14 Lawless's next shift was on April 7. That evening, he and Haskell were dispatched to a scene of "a random shooting that happened at a stop sign." When they arrived, they saw that the driver of a car was dead from "multiple" gun shots "in the chest." Lawless testified that the victim "had basically bled out in the car," and that when the car door was opened, the victim's blood "was pouring out of the car onto us." Because the victim was already dead, Lawless and Haskell left the scene and returned to the station and finished the night without incident.

¶15 Lawless acknowledged that, as a firefighter/paramedic, he has responded to "probably" thirty shooting scenes, some involving "multiple victims," and has watched people die. The scenes to which he had responded over the course of his career, he admitted, include those involving "child drownings," "suicides," and those who suffered "horrific injuries in motor vehicle accidents." But the scenes to which he responded on April 1 and April 7 were "different," he testified, because they were "uncontrolled, extremely unsafe environment[s]." He acknowledged, however, that he and Haskell were advised by dispatch that the scene of the DPS officer shooting on April 1 and the scene at Mohave Community College later that day were secure before they arrived. Indeed, he admitted that "[w]e would not have responded . . . unless it was deemed secure . . . or we got that communication from dispatch." Further, he acknowledged that no weapons were fired at any of the scenes to which he responded on April 1 or April 7.

¶16 In his testimony, Haskell described the events of April 1 and April 7 in a manner similar to Lawless's testimony. Haskell denied, however, that he feared for his personal safety at any of the scenes. He acknowledged having "a little bit of a concern" while responding to the call at Mohave Community College "just because of the dynamic situation," but added that armed law enforcement officers were present to "kind of provid[e] cover to us." Haskell also testified that, as a paramedic, he "respond[s] to dangerous scenes all the time."

¶17 Battalion Chief Kenneth Cameron testified that he was at the scene of the shooting of the DPS officer on April 1. He testified that law enforcement officers from "[m]ultiple agencies," including DPS, were there. When asked if the scene appeared safe, he replied, "I didn't see any threat when I arrived." Cameron testified he was dispatched, later that same day, to the community college, where "one of the suspects that was supposedly in the vehicle that had shot the DPS officer . . . had been shot." When he arrived, he saw "at least four or five different" patrol cars on the scene. He heard no gunfire and did not fear for his own safety. Likewise, Cameron

was dispatched to the shooting at the intersection on April 7. Because the driver was dead at the scene, he testified, neither he nor Lawless remained there for longer than "ten" minutes "at the max." When asked if he feared for his own safety, Cameron replied, "I felt fine."

¶18       Chief Hoke, who has 40 years' experience as a firefighter/paramedic, testified that firefighters and paramedics are routinely called to shooting scenes where law enforcement officers are present. Hoke further testified that he reviewed Lawless's testimony and heard the testimony of Haskell and Cameron, and that, in his opinion, the calls for service on April 1 and April 7 were "completely mundane."

¶19       Therapist Paula Lupo testified that she diagnosed Lawless with chronic PTSD even before the events in April 2022. She admitted that she did not change her diagnosis after those events, but stated that she made a "mistake" by not changing the diagnosis from "chronic" to "acute" PTSD. She testified that she believed Lawless's PTSD had become acute because his symptoms were so severe that he was "literally shutting down."

¶20       Dr. John Walker III, who conducted an independent neuropsychological evaluation of Lawless in November 2022, opined that Lawless's PTSD and other pre-existing mental health conditions in April 2022 made him "susceptible to perceiving events as being more threatening, anxiety provoking, than probably someone who doesn't have" those conditions. Walker testified that he initially determined that the events of April 1 and April 7 "exacerbated" Lawless's pre-existing PTSD. After reviewing Lawless's testimony, however, he was "not certain" that those events exacerbated Lawless's PTSD. Lawless's testimony, Walker testified, indicated that the scenes to which he responded on April 1 and April 7 were "less threatening" than the description Lawless had given when Walker initially evaluated him. Instead of being of the view that the events of April 1 and April 7 "exacerbated" Lawless's PTSD, Walker now believed merely that "there is at least some possibility" that those events "could have exacerbated his symptoms."

¶21       After the hearing, the ICA Administrative Law judge (the "ALJ") issued a ruling summarizing the evidence in detail and making extensive findings. The ALJ found Lawless to be a credible witness when describing his job duties and his mental health condition, but "question[ed] the veracity of [Lawless]'s description of the events of April 1, 2022, and April 7, 2022." The ALJ determined, based on Walker's testimony, that Lawless "did not sustain any exacerbation of his preexisting PTSD" because of the events of April 1 and April 7. The ALJ further determined that

Lawless's position with NAFD was "inherently quite stressful" because it "require[ed] regular encounters with traumatic scenes" involving gunshot wounds inflicted by suspects who were still at large. The stress related to the events of April 1 and April 7, the ALJ found, "was not unexpected, unusual, or extraordinary" for one with Lawless's job duties, and so the ALJ denied Lawless's claim.

**¶22**        After the ALJ summarily affirmed the award on review, Lawless brought this statutory special action challenging the compensability denial. We have jurisdiction under A.R.S. § 12-120.21(B), A.R.S. § 23-951(A), and Arizona Rules of Procedure for Special Actions 3, 11.

## DISCUSSION

**¶23**        Lawless asserts that the ALJ erred in denying his application for benefits because the evidence establishes his injury was caused by unexpected, unusual, or extraordinary stress. When reviewing a workers' compensation award, we defer to the ALJ's factual findings but review questions of law de novo. *Landon v. Indus. Comm'n*, 240 Ariz. 21, 24, ¶ 9 (App. 2016) (citing *Young v. Indus. Comm'n*, 204 Ariz. 267, 270, ¶ 14 (App. 2003)).

**¶24**        A mental injury "aris[es] out of and in the course of employment," and thus is compensable, if the claimant shows, *inter alia*, that (1) work-related stress was a "substantial contributing cause" of the injury and (2) the work-related stress was "unexpected, unusual or extraordinary." A.R.S. § 23-1043.01(B); *see also Owens v. Indus. Comm'n*, 129 Ariz. 79, 82 (App. 1981) (stating that "the claimant bears the burden of establishing all material elements of [a mental injury] claim"). Whether "an injury-causing event" is "unexpected, unusual or extraordinary" under Section 23-1043.01(B) is a legal question, not a medical one, *see Barnes v. Indus. Comm'n*, 156 Ariz. 179, 182 (App. 1988), and is determined "from the standpoint of a reasonable employee with the same or similar job duties and training as the claimant," *France v. Indus. Comm'n*, 250 Ariz. 487, 488, ¶ 1 (2021). As the *France* court held, "the central inquiry" of Section 23-1043.01(B) is "whether the work-related event *itself* imposed stress on the employee that was 'unexpected, unusual or extraordinary.'" *Id*. at 492, ¶ 22 (emphasis in original). Stress that is inherent in a claimant's work is not unexpected, unusual, or extraordinary. *See Sloss v. Indus. Comm'n*, 121 Ariz. 10, 11-12 (1978) (affirming denial of highway patrol officer's claim for mental injury benefits arising from "the usual[,] ordinary and expected incidents of his job"); *Muse v. Indus. Comm'n*, 27 Ariz. App. 312, 313-14

(1976) (affirming denial of bus driver's claim for mental injury benefits because "[n]o particular event precipitated his mental condition," and he "was subjected to nothing other than the usual, ordinary and expected incidents of his job as a bus driver").

¶25        Ample evidence supports the ALJ's finding that Lawless did not show that the events of April 1 and April 7 were unexpected, unusual, or extraordinary. Hoke testified that the calls for service on April 1 and April 7 were "completely mundane." Hoke's testimony was supported, at least to some extent, by Lawless's own testimony that over the course of his career he has responded on numerous occasions to scenes where he had to treat victims of violence and watch injured people die. Although Lawless may have subjectively experienced fear while on-scene on April 1 and April 7, Section 23-1043.01(B)'s test for compensability is an objective one in which "the inquiry focuses on the stress imposed on the worker rather than how the worker experienced it." *France*, 250 Ariz. at 491, ¶ 19. Dispatch told Lawless that the scenes were secure before they arrived. No shots were fired while Lawless was present, nor is there any evidence that any armed gunmen were still in the vicinity when Lawless arrived. Lawless's colleagues who were at the scenes testified that they did not fear for their own physical safety. Further, Lawless and the other paramedics had the protection of armed police officers at the community college when Lawless treated the injured suspect. Although the evidence supports Lawless's testimony about the presence of a significant amount of blood from the deceased gunshot victim at the April 7 shooting, firefighters and paramedics are hardly unfamiliar with the sight of blood. *See Matthews v. Indus. Comm'n*, 254 Ariz. 157, 166, ¶¶ 5, 48 (2022) (holding that "the traumatizing events" police officer experienced, including responding to "active domestic violence scene" involving fatal gunshots, "were a known and expected danger of the job"). The evidence in the record supports the ALJ's conclusion that "any stress related to [Lawless]'s job duties on April 1, 2022, and April 7, 2022, was not unexpected, unusual, or extraordinary."

¶26        Lawless asserts that the ALJ did not make adequate factual findings. According to Lawless, the ALJ "failed to clearly state the facts which support his rulings, and the legal analysis behind the decision." Moreover, Lawless contends, the ALJ could not properly rely on the testimony of Hoke or Cameron, explaining that Hoke "was not present at any" of the scenes, while Cameron "was not at the precise location with Lawless" at the community college and so "could not have experienced the same level of stress." Further, he argues, the ALJ "failed to consider" testimony favorable to Lawless, asserting, for example, that Hoke's use of the words "rarely" and "crazy" in his testimony support his contention that

the events of April 1 and April 7 were out of the ordinary even for paramedics and firefighters. Lawless acknowledges that "[t]he ALJ has authority to resolve" conflicts in the evidence, but insists that the principle "only applies if the ALJ accurately evaluates" the evidence.

¶27        We reject Lawless's arguments about the ALJ's purportedly inadequate findings. The ALJ's 14-page decision in this case discusses the evidence and the basis for the ALJ's findings in great detail. In complaining about the ALJ's failure to refer to specific terms Hoke used in his testimony, Lawless takes Hoke's testimony out of context.[2] In any event, while the ALJ may not have expressly referred to particular statements made by different witnesses in their testimony, we "presume[] that the [ALJ] consider[ed] all relevant evidence." *See Perry v. Indus. Comm'n*, 112 Ariz. 397, 398 (1975) (citation omitted). Although Lawless disagrees with the weight that the ALJ gave to the evidence, we do not re-weigh the evidence, "but consider[] it in the light most favorable to sustaining the award." *Id.* (citation omitted). Lawless's challenge to the ALJ's findings is unavailing.

¶28        For the first time before this court, Lawless argues that his injury was, in fact, a physical rather than a mental injury. Citing Lupo's testimony that his PTSD symptoms became so acute that he "literally shut down," Lawless argues that his "psychological injury is now . . . a physical one" and he "has become physically disabled." Because Lawless never raised this argument during the administrative proceedings, we will not consider it now. *See Porteadores Del Noroeste S.A. De C.V. v. Indus. Comm'n*, 234 Ariz. 53, 59, ¶ 20 n.6 (App. 2014).

¶29        Finally, Lawless argues that Section 23-1043.01(B) violates constitutional equal protection guarantees by treating applicants claiming

---

[2] Contrary to Lawless's suggestion, Hoke did not use the word "rarely" when describing the events of April 1 or April 7. Instead, Hoke stated that, although paramedics often "struggle" with powerful emotions "when . . . dealing with" child fatalities, they "rarely" experience similar emotional trauma when responding to the scene of an injured adult. On the contrary, he stated, "this is what we do every day." Likewise, Hoke did not describe the events of April 1 or April 7 as "crazy." In testifying about the April 7 event, Hoke stated that he did not respond to the scene but, instead, phoned Cameron to ask about it. Hoke explained his phone call to Cameron by stating, "[A]nytime we have a call that's kind of crazy, you know, I kind of ask, you know, what's happening?" He further testified, however, that after speaking with Cameron about the April 7 event, he concluded "it was not that big of a deal."

mental injury differently from those claiming physical injury. The Arizona Supreme Court recently rejected an "equal protection" challenge to A.R.S. § 23-1043.01(B) of Arizona's Workers' Compensation Act (the "WCA"), A.R.S. §§ 23-901 to -1105. Specifically, that Court held that the WCA does not violate equal protection guarantees by requiring claimants for benefits based on mental injuries, but not physical injuries, to establish that the injury was caused by "unexpected, unusual or extraordinary stress." *Matthews v. Indus. Comm'n*, 254 Ariz. 157, 167, ¶¶ 50-52 (2022).[3]

**¶30**        Lawless now raises a somewhat different equal protection argument. According to Lawless, the WCA allows a claimant to "reopen a previous industrial injury claim with [a] showing of a new, additional or previously undiscovered condition." A.R.S. § 23-1061(H). Noting that he "previously utilized the benefits of A.R.S. § 38-673 to treat his diagnosis of PTSD," Lawless argues that his claim in this case is, essentially, a re-opening of his prior claim based on "his 'newest' diagnosis of recurring PTSD." Workers suffering mental injury (such as himself) should not be required to satisfy Section 23-1043.01(B), Lawless contends, when all they seek to do is "reopen their claims when additional treatment is necessary."

**¶31**        Lawless's argument improperly conflates disability benefits under the WCA with traumatic-event mental health benefits under A.R.S. §§ 38-672 to 673, the "Officer Craig Tiger Act." *See* 2018 Ariz. Sess. Laws, ch. 259, § 4, H.B. 2502 (2nd Reg. Sess.). The two are distinct statutory schemes serving distinct purposes.

**¶32**        The WCA provides disability benefits to workers unable to work due to injuries sustained while performing work-related activities. *See Carnes v. Phoenix Newspapers, Inc.*, 227 Ariz. 32, 37, ¶ 18 (App. 2011). The

---

[3] In *Matthews*, a police officer whose disability claim was denied argued that the WCA violates equal protection guarantees by treating claimants with mental injuries differently from those with physical injuries. Claimants alleging mental injuries, he reasoned, were required to prove that the injury arose from an "unexpected, unusual or extraordinary stress," while no such requirement is imposed on claimants alleging physical injuries. 254 Ariz. at 167, ¶ 50. In rejecting the claimant's argument, the *Matthews* court held that the constitutional provision on which the WCA is based contemplated compensation for "injury by accident," which "necessarily entails an unexpected event." *Id.* Because claims for both physical and mental injuries must arise out of an unexpected event, claimants alleging physical and mental injuries are not subjected to "differential treatment." *Id.*

Officer Craig Tiger Act, by contrast, entitles peace officers, firefighters, and other public safety employees to receive counseling, at their employers' expense, after being exposed to certain traumatic events, and provides additional protections against loss of income while receiving treatment. *See* A.R.S. §§ 38-672, -673. An application for benefits under the Officer Craig Tiger Act is not a "claim" under the WCA, nor does the receipt of benefits under the former establish entitlement to disability benefits under the latter. On the contrary, the Officer Craig Tiger Act expressly provides that "[p]ayment by the employer for licensed counseling pursuant to this section does not create a presumption that a claim is compensable under [Section 23-1043.01(B)]." A.R.S. § 38-673(F).

¶33            Lawless's receipt of counseling services under the Officer Craig Tiger Act did not, of course, preclude him from also applying for disability benefits under the WCA. His receipt of services under the Officer Craig Tiger Act did not, however, excuse him from satisfying the WCA's eligibility requirements when applying for disability benefits. Like all claimants making initial workers' compensation claims, Lawless must establish the compensability of his claimed injury. Requiring Lawless to establish the compensability of his claimed injury does not implicate equal protection concerns. *See Vong v. Aune*, 235 Ariz. 116, 123, ¶ 32 (App. 2014) ("The equal protection clauses of the state and federal constitutions generally require that all persons subject to state legislation shall be treated alike under similar circumstances." (cleaned up)).

¶34            Claimants with previously accepted claims for physical injury may "reopen" their claims "on the basis of a new, additional or previously undiscovered temporary or permanent condition." A.R.S. § 23-1061(H). Although it is not entirely clear, Lawless appears to suggest that Section 23-1061(H) implicates equal protection guarantees because it purportedly applies only to claims for physical, and not mental, injury. But nothing in Section 23-1061(H) limits its application to claims of physical injury. In any event, this case does not involve a request to re-open a prior claim, and so Section 23-1061(H) has no application here. We reject Lawless's equal protection claim as wholly meritless.

## CONCLUSION

¶**35** Lawless has not shown that the ALJ abused his discretion in determining that Lawless failed to establish that he suffered mental injury caused by unexpected, unusual, or extraordinary stress. Accordingly, we affirm the award denying compensability.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:            JR